UNDER SEAL

1  Chiharu G. Sekino (SBN 306589)
   Shepherd Finkelman Miller
2  & Shah, LLP
   44 Montgomery Street, Suite 650
3  San Francisco, CA 94104
   Telephone: (415) 429-5272
4  Facsimile: (866) 300-7367
   Email: csekino@sfmslaw.com
5
   *Attorneys for Plaintiff-Relator*
6
   [Additional Counsel Listed On Signature Page]
7

**FILED**

DEC 2 2 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8              **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                         CV 17    7278 KAW

11  UNITED STATES OF AMERICA; and the )
    States of CALIFORNIA, ILLINOIS,   )
12  INDIANA, NEW JERSEY, NEW YORK,    )
    and OHIO *ex rel.* [UNDER SEAL],  )
13                                     )
                      Plaintiff-Relator )   **COMPLAINT** PURSUANT TO THE
14                                     )   FEDERAL FALSE CLAIMS ACT
                                       )   31 U.S.C. §§ 3729, *et seq.*
15          v.                         )
                                       )
16  [UNDER SEAL]                       )   **FILED UNDER SEAL PURSUANT TO**
                                       )   **31 U.S.C. § 3730(b)(2)**
17                                     )
                                       )   DO NOT PLACE ON PACER
18                                     )
                                       )   JURY TRIAL DEMANDED
19                      Defendants.    )
                                       )
20

21

22              **DOCUMENT TO BE KEPT UNDER SEAL**

23

24

25

26

27

28

Chiharu G. Sekino (SBN 306589)
Shepherd Finkelman Miller
 & Shah, LLP
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 429-5272
Facsimile: (866) 300-7367
Email: csekino@sfmslaw.com

*Attorneys for Plaintiff-Relator*

[Additional Counsel Listed On Signature Page]

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA; and the
States of CALIFORNIA, ILLINOIS,
INDIANA, NEW JERSEY, NEW YORK,
and OHIO *ex rel.* [UNDER SEAL],

               Plaintiff-Relator

      v.

[UNDER SEAL]



               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT** PURSUANT TO THE
FEDERAL FALSE CLAIMS ACT
31 U.S.C. §§ 3729, *et seq.*

**FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**

DO NOT PLACE ON PACER

JURY TRIAL DEMANDED

## DOCUMENT TO BE KEPT UNDER SEAL

1 | Chiharu G. Sekino (SBN 306589)
Shepherd Finkelman Miller
2 | & Shah, LLP
44 Montgomery Street, Suite 650
3 | San Francisco, CA 94104
Telephone: (415) 429-5272
4 | Facsimile: (866) 300-7367
Email: csekino@sfmslaw.com

5 | *Attorneys for Plaintiff-Relator*

6 | [Additional Counsel Listed On Signature Page]

7

8 | **IN THE UNITED STATES DISTRICT COURT**

9 | **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11 | UNITED STATES OF AMERICA; and the )
States of CALIFORNIA, ILLINOIS, )
12 | INDIANA, NEW JERSEY, NEW YORK, )
and OHIO *ex rel.*, BRIAN SILVER, )
13 | )  CASE NO.
Plaintiff-Relator )  **COMPLAINT**
14 | )
v. )  **COMPLAINT PURSUANT TO THE**
15 | )  **FEDERAL FALSE CLAIMS ACT**
AMERIWOUND, LLC, CALIFORNIA )  **31 U.S.C. §§ 3729, et seq.**
16 | WOUND HEALTH, P.C., WOUND )
HEALTH, LLC, DANIEL BORISON, )  **FILED UNDER SEAL PURSUANT TO**
17 | M.D., SAMSON FIXLER, SOL MAJER, )  **31 U.S.C. § 3730(b)(2)**
MILTON SCHACHTER, SHLOMO )
18 | RECHNITZ, and DOES NO. 1-10, )
Whose Names Are Currently Unknown, )
19 | )
Defendants. )
20 | _____)  JURY TRIAL DEMANDED

21

22 | On behalf of the United States of America ("United States") and the States of California

23 | ("California"), Illinois ("Illinois"), Indiana ("Indiana"), New Jersey ("New Jersey"), New York

24 | ("New York"), and Ohio ("Ohio"), Plaintiff-Relator Brian Silver ("Plaintiff-Relator Silver" or

25 | "Plaintiff" or "Relator") files this Complaint against Defendants (defined below), pursuant to the

26 | provisions of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, the Federal Anti-

27 | Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, the California False Claims Act ("CA-FCA"),

28 | Cal. Gov. Code §§ 12650, *et seq.*, Illinois Whistleblower Reward and Protection Act, 740 ILCS

175, *et seq.*, the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5, *et seq.*, the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1, *et seq.*, the New York State False Claims Act, State Finance Law § 189, and Ohio Revised Code § 5164.35, and alleges as follows:

## I.   INTRODUCTION

1.    Plaintiff-Relator Silver brings this Complaint seeking damages and civil penalties against AmeriWound, LLC ("AmeriWound"), California Wound Health, P.C. ("CWH"), Wound Health, LLC ("WH") (collectively, AmeriWound, CWH and WH, the "AmeriWound Companies"); Daniel Borison, M.D. ("Borison"), Samson Fixler ("Fixler"), Sol Majer ("Majer"), Milton Schachter ("Schachter"), and Shlomo Rechnitz ("Rechnitz," collectively, with Borison, Fixler, Majer, Schachter, and the AmeriWound Companies, the "Defendants"), pursuant to the provisions of the FCA, the AKS, and the analogous state laws of California, Illinois, Indiana, New Jersey, New York, Ohio, and Pennsylvania (Illinois, Indiana, New Jersey, New York, Ohio, and Pennsylvania, collectively, the "Secondary States").

2.    As set forth more fully below, Plaintiff-Relator Silver alleges in this action that Defendants concealed material information regarding Rechnitz's relationship with the AmeriWound Companies and thereby defrauded the federal government (the "Government") and California, and, upon information and belief, the Secondary States, out of millions of Medicare and Medicaid dollars for the reimbursement of claims for medically unnecessary and excessive charges for wound care services provided by the AmeriWound Companies to patients in skilled nursing facilities ("SNF" or "SNFs") located in California and, upon information and belief, in the Secondary States.

## II.   JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.  This Court has supplemental jurisdiction over the counts relating to the CA-FCA and the analogous state laws of the Secondary States pursuant to 28 U.S.C. § 1367.

-2-

4.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §
3732(a) because Defendants can be found in, reside, or transact business in this District.
Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31
U.S.C. § 3729 occurred in this District.

5.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because
Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729
occurred in this District.

6.     Plaintiff-Relator Silver has complied with all procedural requirements of the laws
under which this case is brought.

7.     Plaintiff-Relator Silver is the original source of the information upon which this
Complaint is based and the facts alleged herein, as that phrase is used in the FCA and other laws
at issue in this Complaint. Relator possesses first-hand knowledge of the AmeriWound
Companies' conflicted relationship with Rechnitz, as well as the AmeriWound Companies'
systematic practice of billing the Government and California by providing unnecessary and
excessive wound care services to SNF patients.

8.     Plaintiff-Relator Silver brings this action based on his direct knowledge and,
where indicated, upon information and belief. None of the actionable allegations set forth in this
Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4).

## III.    THE PARTIES

9.     Plaintiff-Relator Silver currently resides in Orange County, California, and was
employed by the AmeriWound Companies as an Area Manager for Southern California from
October 2012 until June 2014. As an Area Manager, Silver was responsible for overseeing the
daily operations of physician wound care services provided by the AmeriWound Companies to
patients residing at twenty-five SNFs in Southern California. Relator assisted with the recruiting
of physicians and mid-level providers, nurse practitioners, and physician assistants, and
conducted presentations to executives of multi-state SNF ownership groups in order to induce

-3-

1  them to engage the services of the AmeriWound Companies.

2      10.     Relator reported directly to AmeriWound Chief Executive Officer Schachter and
3  regularly interacted with Chief Operating Officer Fixler and Chief Medical Officer Borison. He
4  also received guidance and direction from Rechnitz.

5      11.     Plaintiff-Relator Silver brings this action on behalf of the United States as
6  plaintiff, which seeks relief on behalf of the Department of Health and Human Services
7  ("HHS"), the Centers for Medicare and Medicaid Services ("CMS") and federally-funded
8  programs including Medicare and Medicaid.

9      12.     Plaintiff-Relator Silver also brings this action on behalf of the State of California
10  as plaintiff, which seeks relief on behalf of the California Department of Health Care Services
11  and its Medi-Cal program, and on behalf of the States of Illinois, Indiana, New Jersey, New
12  York and Ohio.

13      13.     AmeriWound, LLC, is a California corporation with headquarters in Mayfield
14  Heights, Ohio, that provides physician-based wound care to SNFs in California, Illinois, Indiana,
15  New Jersey, New York, Ohio, and Pennsylvania. Relator believes that the name of the Medicare
16  billing entity is "Ameriwound Physicians PA LLC," with provider number NPI 1043679855.

17      14.     California Wound Health, P.C., is a California corporation that maintains its
18  headquarters in Mayfield Heights, Ohio, and was created by AmeriWound to comply with
19  California's stringent guidelines governing the operation of health and medical facilities,
20  including the requirement that health and medical facilities operating in California be
21  physician-owned. *See* Cal. Corp. Code § 13401.5(a). Borison is identified in Government
22  filings as the physician/owner, as well as the sole owner of CWH. CWH is registered as a
23  Medicare group practice, with provider number NPI 1609129311.

24      15.     Wound Health, LLC, is a California holding company with corporate
25  headquarters in Los Angeles, California. WH's Articles of Organization were filed in 2012; the
26  Articles identify Rechnitz as the company's agent for service of process and indicate that WH

27

28                                              -4-

1    would be managed by one person. In WH's March 2016 filing, Rechnitz is listed as the sole
2    manager of WH.

3        16.    Daniel Borison, M.D., is a physician licensed to practice medicine in both Ohio
4    and California and is registered as a Medicare provider, with provider number NPI 1669423836.
5    Borison has served as the President of CWH and as Chief Medical Officer ("CMO") for both
6    AmeriWound and CWH. In addition, Borison has treated patients and has issued medical
7    guidelines to other physicians and practitioners at the SNFs.

8        17.    Samson Fixler, is the Chief Operating Officer ("COO") of both AmeriWound and
9    CWH. Like Schachter, Fixler is responsible for maximizing patient population at the SNFs,
10   hiring physicians to provide services to the SNFs, and carrying out the directives of Rechnitz.

11       18.    Sol Majer plays a significant role in the operations of both AmeriWound and
12   CWH, serving as the principal liaison between Rechnitz and the AmeriWound Companies'
13   management.

14       19.    Milton Schachter is the Chief Executive Officer ("CEO") of both AmeriWound
15   and CWH, and, in this capacity, is responsible for maximizing the patient population at the
16   SNFs, hiring physicians to provide services to the SNFs, and carrying out the directives of Majer
17   and Rechnitz.

18       20.    Shlomo Rechnitz, upon information and belief, has ownership interests in and/or
19   financial control of the AmeriWound Companies. In addition, Rechnitz is the owner of Brius
20   Health Care Services ("Brius"), the largest provider of SNFs in California, and is the co-owner
21   of Rockport Healthcare Support Services, LLC ("Rockport"), the management company that
22   handles Rechnitz's facilities' administrative needs. Rechnitz is also the Chief Financial Officer
23   ("CFO") of Ramat Medical ("Ramat"), a supplier of beds and durable medical equipment to
24   SNFs. He and his twin brother are co-founders of TwinMed, another medical supplier to SNFs.
25   Rechnitz also provides financial support to Shoreline Ambulance ("Shoreline") and owns a
26   California-based pharmacy company, Twin Pharmacy, both of which provide services and

27

28                                              -5-

medicines to the SNFs. Ramat, TwinMed, Shoreline, and Twin Pharmacy all contract with Brius and Rockport facilities for their respective needs.

## IV. FACTUAL ALLEGATIONS

### A. Government-Funded Healthcare Programs: Medicare, Medicaid, and Medi-Cal

i. Overview of Medicare

21. In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. §1395, *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426-1. The regulations implementing the Medicare Program are found at 42 C.F.R. § 409, *et seq.*

22. HHS is responsible for the administration and supervision of the Medicare Program. CMS is a component of HHS and is directly responsible for the administration of the Medicare Program. Medicare Part B covers physician services, as well as a variety of "medical and other health services." *See* 43 U.S.C. §§ 1395j-1395w-4. The allegations herein involve Part B services billed by the Defendants to Medicare.

23. To participate in the Medicare program, a provider of services must file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider certifies that he/she/it is knowledgeable of Medicare requirements on the Medicare provider enrollment form. The provider agreement requires compliance with the requirements that the HHS Secretary deems necessary for participation in the program. *Id.*

24. Medicare enters into agreements with physicians to establish the physician's eligibility to participate in the Medicare program. For the physicians to be eligible for participation in the Medicare program, physicians must certify that they agree to comply with the AKS, among other federal health care laws. Specifically, on the Medicare enrollment form, CMS Form 855I, the "Certification Statement" that the medical provider signs states: "You MUST sign and date the certification statement below in order to be enrolled in the Medicare

-6-

program. In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below." Those requirements include:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . The Medicare laws, regulations and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

> \* \* \*

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

25. Part B of the Medicare Program is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Eligible individuals who are aged sixty-five or older or disabled may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by HHS. Payments under the Medicare Program are often made directly to service providers such as physicians, rather than to the patient/beneficiary. This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case, the provider bills the Medicare Program.

26. Part B of the Medicare Program covers certain facility use and medical services provided to qualified patients/beneficiaries, including outpatient services such as the services rendered by Defendants.

27. The United States provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS. To assist in the administration of Part B of the Medicare Program, CMS contracts with Medicare Administrative Contractors ("MACs"). MACs process the reimbursement of claims for Part B services submitted by Defendants on CMS Form 1500 to Medicare.

28. CMS Form 1500 currently requires the following certification by physicians and suppliers as a pre-condition of payment:

-7-

1

2

3

4

5

6

7

8

9

10

11

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

12     29.     In submitting Medicare claim forms, then, providers must certify: (1) that they

13   are knowledgeable of Medicare requirements; (2) that the information included on the form

14   presents an accurate description of the services rendered; and (3) that the services were

15   medically indicated and necessary for the health of the patient.

16     30.     Medicare and other government-funded healthcare programs pay only for those

17   services that meet appropriate medical necessity standards, and providers may not bill for

18   services that do not meet the applicable standards set by Medicare for medical necessity. *See* 42

19   U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1); Medicare Carrier's Manual § 2049

20   (Medicare and other federal healthcare programs only cover medical services that are

21   "reasonable and necessary for the diagnosis or treatment of illness or injury"); *see* California

22   Welfare and Institutions Code Sec. 14133.3.

23     31.     Accordingly, providers may only submit claims for Medicare reimbursement for

24   "reasonable and necessary" medical services. In submitting claims, providers make certain

25   express certifications, including any assurance that the services were "provided economically

26   and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1); *see also* 42

27

28                                                    -8-

U.S.C. § 1395n(a)(2)(B) (to receive payment for claims providers must certify that services were "medically required"). Additionally, each time a provider submits a claim, the provider impliedly certifies that the service was provided in accordance with Federal and State statutes, regulations, and program rules.

32.     Similarly, a claim for "worthless" medical care violates the FCA because the government believes it is paying for services or items that have medical value when, in fact, the services or items are essentially worthless. *See Mikes v. Straus*, 274 F.3d 687, 702-04 (2d Cir. 2001); *United States v. Smithkline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001).

33.     Defendants were required to comply with all the applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare Part B, and had a duty to be knowledgeable of the statutes, regulations, and guidelines regarding coverage and payment for Medicare services. Defendants certified that they were knowledgeable of Medicare requirements on their Medicare provider enrollment forms and on each CMS Form 1500 they submitted to Medicare.

ii.     The Medicaid Program

34.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. Each state administers a state Medicaid program. The federal Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

35.     The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent. The federal government pays to the state the statutorily established share of the "total amount expended . . . as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1).

-9-

36. The law requires state Medicaid plans to execute written agreements between the Medicaid agency and each provider furnishing services under the plan ("provider agreements"). 42 C.F.R. § 431.107(b). Providers who participate in the Medicaid program must sign provider agreements with their states that certify compliance with the state and federal Medicaid requirements, including the AKS. Although there are variations among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all state and federal laws and Medicaid regulations in billing the state Medicaid program for services or supplies furnished.

37. Furthermore, in many states, Medicaid providers, including both physicians and pharmacies, must affirmatively certify, as a condition of payment of the claims submitted for reimbursement by Medicaid, compliance with applicable federal and state laws and regulations.

38. AmeriWound operates SNFs in California, Illinois, Indiana, New Jersey, New York, Ohio, and Pennsylvania. Each SNF, and each AmeriWound physician performing wound care services, is a "provider" for Medicaid purposes. The chart below reflects the provider agreements of each of these states, including provider certification requirements for their Medicaid programs:

-10-

| California | The Provider Agreement that a provider is required to sign to participate in the State of California Program requires a provider to agree to the following:

'2. Compliance With Laws and Regulations. Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHS pursuant to these Chapters.... Provider further agrees to comply with all federal laws and regulations governing and regulating Medicaid providers."

'3. Forbidden Conduct. Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program."

'14. Provider Fraud and Abuse. Provider agrees that it shall not engage in or commit fraud and abuse. 'Fraud' . . . includes any act that constitutes fraud under applicable federal or state law."

'18. Prohibition of Rebate, Refund, or Discount. Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary. Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission preference, patronage dividend, discount, or any other gratuitous consideration in connection with the rending of health care services to any Medi-Cal beneficiary. Provider further agrees that it will not take any other action or receive any other benefit prohibited by state or federal law."

'Provider agrees that compliance with the provisions of this agreement is a condition precedent to payment to provider."

*See* California Medi-Cal Provider Agreement. |

-11-

| Illinois | The Agreement for Participation in the Illinois Medical Assistance Program that a provider is required to sign to participate in the State of Illinois' Program requires a provider to agree to the following:

"1. The Provider agrees, on a continuing basis, to comply with all current and future program policy and billing provisions as set forth in the applicable Department of Public Aid Medical Assistance Program rules and handbooks."

"3. The Provider agrees, on a continuing basis, to comply with Federal standards specified in Title XIX and XXI of the Social Security Act and with all other applicable Federal and State laws and regulations."

"6. The Provider agrees to be fully liable for the truth, accuracy and completeness of all claims submitted electronically or on hard copy to the Department for payment. Provider acknowledges that it understands the laws and handbook provisions regarding services and certifies that the services will be provided in compliance with such laws and handbook provisions. Provider further acknowledges that compliance with such laws and handbook provisions is a condition of payment for all claims submitted. Any submittal of false or fraudulent claim or claims or any concealment of a material fact may be prosecuted under applicable Federal and State laws."

*See* Agreement for Participation in the Illinois Medical Assistance Program, ¶¶ 1, 3, 6. |

-12-

| Indiana | The Indiana Health Coverage Programs ("IHCP") Provider Agreement that a provider is required to sign to participate in the State of Indiana's Program requires a provider to agree to the following: |
|---|---|
| | "By execution of this Agreement, the undersigned entity ("Provider") requests enrollment as a provider in the Indiana Health Coverage Programs. As an enrolled provider in the Indiana Health Coverage Programs, the undersigned entity agrees to provide Medicaid-covered . . . services and/or supplies to Indiana Medicaid . . . members. As a condition of enrollment, this agreement cannot be altered and the Provider agrees to all of the following:..." |
| | "2. To comply with all federal and state statutes and regulations pertaining to the Medicaid Program or CHIP, as they may be amended from time to time." |
| | "5. To provide Medicaid-covered and CHIP-covered services and/or supplies for which federal financial participation is available for Medicaid and CHIP members pursuant to all applicable federal and state statutes and regulations." |
| | "11. To abide by the Indiana Health Coverage Programs Provider Manual [Chapter 13 of which defines Medicaid Fraud to include soliciting, offering, or receiving a kickback, bribe, or rebate]..." |
| | "13. To be individually responsible and accountable for the completion, accuracy, and validity of all claims filed under the provider number issued, including claims filed by the Provider, the Provider's employees, or the Provider's agents. Provider understands that the submission of false claims, statements, and documents or the concealment of material fact may be prosecuted under the applicable Federal and/or State law." |
| | "16. To submit claims that can be documented by Provider as being strictly for ... compensation that Provider is legally entitled to receive." |
| | *See* Indiana Health Coverage Programs ("IHCP") Provider Agreement, ¶¶ 2, 5, 11, 16(c). |
| New Jersey | The Provider Agreement that a provider is required to sign to participate in the State of New Jersey Program requires a provider to agree to the following terms and conditions: |
| | "Provider agrees: |
| | (1) To comply with all applicable State and Federal laws, policies, rules and regulations...." |

-13-

| | |
|---|---|
| **New York** | The Provider Certification that a provider is required to sign to participate in the State of New York Program also requires a provider to agree to the following terms and conditions:<br><br>'As of [date of the certification], all claims submitted electronically or on paper to the State's Medicaid fiscal agent . . . will be subject to the following certification...."<br><br>'I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations...."<br><br>'All statements, data and information transmitted are true, accurate and complete to the best of my knowledge; no material fact has been omitted; I understand that payment and satisfaction of this claim will be from federal, state and local public funds and that I may be prosecuted under applicable federal and state laws for any violation of the terms of this certification including but not limited to false claims, statements or documents, or concealment of a material fact...."<br><br>'In submitting claims under this agreement I understand and agree that I (or the entity) shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the New York State Department of Health and the Office of the Medicaid Inspector General as set forth in statute or title 18 of the Official Compilation of Codes, Rules and Regulation of New York State and other publications of the Department, including eMed NY Provider Manuals and other official bulletins of the Department."<br><br>*See* New York Certification Statement for Provider Billing Medicaid. |
| **Ohio** | The Provider Agreement that a provider is required to sign to participate in the State of Ohio Program requires a provider to agree to the following terms and conditions:<br><br>'This provider agreement is a contract between the Ohio Department of Job and Family Services (the Department) and the undersigned provider of medical assistance services in which the Provider agrees to comply with the terms of this provider agreement, state statutes, Ohio Administrative Code rules, and Federal statutes and rules...."<br><br>*See* Ohio Health Plans Provider Enrollment Application/Agreement at 13. |
| **Pennsylvania** | The Provider Agreement that a provider is required to sign to participate in the Commonwealth of Pennsylvania Program requires a provider to agree to the following terms and conditions:<br><br>'A. The Provider agrees to participate in the Pennsylvania Medical Assistance Program (the 'Program'), and in the course of such participation to comply with all federal and Pennsylvania laws generally and specifically   governing participation in the Program. The foregoing include but are not limited to: 42 U.S.C. § 1396 *et seq.*, 62 P.S.§§ 441-451,42 C.F.R. §§431-481 and the regulations adopted by the Department of Public Welfare (the 'Department'). The Provider agrees to be knowledgeable of and to comply with applicable rules, regulations, rates and fee schedules promulgated under such laws and any amendments thereto."<br><br>*See* Pennsylvania Provider Agreement, § 1(A). |

-14-

1    iii.    The California Medicaid Program: "Medi-Cal"

2        39.    The California Department of Health Care Services ("DHCS") (formerly the

3    California Department of Health Services ("DHS")) enacts regulations for California's State

4    Medicaid program, Medi-Cal. As participating Medi-Cal providers, the SNFs were and are

5    subject to DHCS regulations that require them to provide services to Medi-Cal patients at their

6    most favorable rates.

7        40.    Medi-Cal Provider Agreements also require, consistent with the program's public

8    purposes, that the Defendants charge their lowest fees to DHCS and refrain from conduct that

9    would harm the Medi-Cal program or its beneficiaries. Among other commitments, Provider

10   Defendants agreed to do all of the following:

11           Compliance with Laws and Regulations. Provider agrees to comply with all
             applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code
12           (commencing with Sections 14000 and 14200), and any applicable rules or
             regulations promulgated by DHS pursuant to these chapters. . . .
13
             Forbidden Conduct. Provider agrees that it shall not engage in conduct
14           inimical to the public health, morals, welfare and safety of any Medi-Cal
             beneficiary, or the fiscal integrity of the Medi-Cal program.
15                                              . . .
             Provider Fraud and Abuse. Provider agrees that it shall not engage in
16           fraud or abuse.
                                                . . .
17           Prohibition of Rebate, Refund or Discount. Provider agrees that it shall not offer,
             give, furnish, or deliver any rebate, refund, commission, preference, patronage
18           dividend, discount, or any other gratuitous consideration, in connection with the
             rendering of health care services to any Medi-Cal beneficiary. Provider further
19           agrees that it shall not solicit, request, accept, or receive, any rebate, refund,
             commission, preference, patronage dividend, discount, or any other gratuitous
20           consideration, in connection with the rendering of health care services to any
             Medi-Cal beneficiary. Provider further agrees that it shall not take any other
21           action or receive any other benefit prohibited by state or federal law.

22       41.    In other words, the Defendants agreed to bill Medi-Cal at their lowest rates, not to

23   give or take kickbacks, and to conduct their business relationship with DHCS with a view to the

24   program's public purpose and the welfare of California's medically indigent citizens.

25

26

27

28                                           -15-

1      42.     To seek reimbursement for treatment of a patient, a provider participating in

2  Medi-Cal submits a claim to the contractor that administers the Medi-Cal program. In seeking

3  reimbursement, the provider must state his/her charge for the particular service provided.

4      43.     Using state funds, Medi-Cal pays a claim if the beneficiary is eligible, the

5  provider is authorized to bill Medi-Cal, the service is covered by Medi-Cal, and no information

6  known to the Medi-Cal program indicates the claim is otherwise improper or in violation of

7  billing rules. Medi-Cal receives reimbursement from the federal government for the federal

8  share of the Medi-Cal expenditures. The claims that have been submitted to Medi-Cal are used

9  to support the provider's reimbursement request. In this way, if a provider submits a fraudulent

10  claim to Medi-Cal, s/he has caused a false claim to be submitted to both California and the

11  federal government.

12  **B.**    **Applicable Law**

13       i.     The Federal False Claims Act

14      44.     The federal FCA provides, *inter alia*, that any person who (1) "knowingly

15  presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2)

16  "knowingly makes, uses, or causes to be made or used, a false record or statement material to a

17  false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble

18  damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

19      45.     The terms "knowing" and "knowingly" are defined to mean "that a person, with

20  respect to information (1) has actual knowledge of the information; (2) acts in deliberate

21  ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or

22  falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud

23  is not required. 31 U.S.C. § 3729(b)(1)(B).

24      46.     The term "claim" means "any request or demand, whether under a contract or

25  otherwise, for money or property and whether or not the United States has title to the money or

26  property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is

27

28                                                   -16-

1  made to a contractor, grantee, or other recipient, if the money or property is to be spent or used
2  on the Government's behalf or to advance a Government program or interest, and if the United
3  States Government (a) provides or has provided any portion of the money or property requested
4  or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of
5  the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

6              ii.       The Federal Anti-Kickback Statute

7          47.      The AKS, 42 U.S.C. § 1320a-7b(b), which also applies to the state Medicaid
8  programs and/or municipal programs, provides penalties for individuals or entities that
9  knowingly and willfully offer, pay, solicit, or receive remuneration to induce the referral of
10  business reimbursable under Government-Funded Healthcare Programs. The offense is a felony
11  punishable by fines of up to $25,000 and imprisonment for up to five years.

12         48.      The federal healthcare AKS arose out of Congressional concern that payoffs to
13  those who can influence healthcare decisions will result in goods and services being provided
14  that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient
15  population. To protect the integrity of the Government-Funded Healthcare Programs from these
16  difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in
17  any form resulting in federal program expenditures, regardless of whether the particular
18  kickback actually gives rise to overutilization or poor quality of care.

19         49.      The Balanced Budget Act of 1997 amended the federal healthcare AKS to include
20  administrative civil penalties of $50,000 for each violation, as well as an assessment of not more
21  than three times the amount of remuneration offered, paid, solicited, or received, without regard
22  to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42
23  U.S.C. § 1320a-7a(a).

24         50.      In accordance with the AKS, applicable regulations directly prohibit providers
25  from receiving remuneration paid with the intent to induce referrals or business orders. Thus,
26  providers may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce
27

28                                                     -17-

1  physicians or others in order to recommend drugs or healthcare services that may be paid for by
2  a Government-Funded Healthcare Programs.

3      51.    The AKS is violated if "one purpose" of the remuneration is to induce federal
4  program business. *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985). Violations may result in
5  a five-year prison term, $25,000 criminal penalty, $50,000 administrative penalty, treble
6  damages, and exclusion from Medicare and Medicaid. 42 C.F.R. § 1003.102.

7      52.    Such remunerations are kickbacks when paid to induce or reward healthcare
8  providers for, *inter alia*, recommending medical services. Kickbacks increase
9  Government-Funded Healthcare Program expenses by inducing medically unnecessary services
10 and excessive reimbursements. Kickbacks also reduce a patient's healthcare choices, as
11 physicians may recommend healthcare services based on the physician's own financial interests
12 rather than according to the patient's medical needs.

13     53.    The AKS prohibits knowingly and willfully offering, paying, soliciting, or
14 receiving remuneration to or from any person to induce such person to order or receive any items
15 or services for which payment may be made under a federal healthcare program unless the
16 arrangement fits within a regulatory "safe harbor." Certain statutory exceptions and safe harbors
17 exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3).
18 None of the statutory exceptions or regulatory safe harbors protect Defendants from liability for
19 the conduct alleged herein.

20     54.    The Patient Protection and Affordable Care Act ("PPACA"), Public Law No.
21 111-148, § 6402(g), amended the AKS, 42 U.S.C. § 1320a-7b(b), to specifically allow violations
22 of its "anti-kickback" provisions to be enforced under the FCA. The PPACA also amended the
23 Social Security Act's "intent requirement" to make clear that violations of its anti-kickback
24 provisions, like violations of the FCA, may occur even if an individual does "not have actual
25 knowledge" or "specific intent to commit a violation." Public Law No. 111-148, § 6402(h).

26

27

28                                            -18-

55.     A violation of the AKS is a violation of the federal FCA. The FCA, 31 U.S.C. §

3729, provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

56.     Medicare, Medicaid, and Medi-Cal (individually and collectively, the

"Government-Funded Healthcare Program(s)"), require every provider or supplier to ensure

compliance with the provisions of the AKS and other federal laws governing the provision of

healthcare services in the United States. Compliance with the AKS is expressly and impliedly

required for reimbursement of Government-Funded Healthcare Programs, and claims made in

violation of the law are actionable civilly under the FCA. *See* 42 U.S.C. § 1320a-7b(g) (2010)

(stating that a "claim that includes items or services resulting from a violation of . . . [the AKS]

constitutes a false or fraudulent claim for purposes of [the FCA]").

57.     Further, the United States has deemed violations of the AKS to be material to its

decision to pay health care claims, demonstrated in part through the requirement that providers

and suppliers certify compliance with the AKS as a condition of payment under Government-

Funded Healthcare Programs. If the United States had been aware that the claims discussed

herein resulted from conduct that violated the AKS, the United States would not have paid the

claims submitted in connection with the Defendants' unlawful conduct.

        iii.    The California False Claims Act

58.     The CA-FCA is modeled after the federal FCA and contains provisions similar to

those quoted in paragraphs 44 through 46.

59.     This is a *qui tam* action brought by Plaintiff-Relator Silver on behalf of the State of

-19-

1    California to recover treble damages and civil penalties under the California False Claims Act,

2    Cal. Gov't Code § 12650, *et seq.*

3        60.    Cal. Gov't Code § 12651(a) provides liability for any person who:

4            (1) knowingly presents, or causes to be presented, to an officer or employee of the
             state or of any political division thereof, a false claim for payment or approval;

5
             (2) knowingly makes, uses, or causes to be made or used, a false record or
6            statement to get a false claim paid or approved by the state or by any political
             subdivision;

7
             (3) conspires to defraud the state or any political subdivision by getting a false
8            claim allowed or paid by the state or by any political subdivision; and/or

9            (4) is a beneficiary of an inadvertent submission of a false claim to the state or a
             political subdivision, subsequently discovers the falsity of the claim, and fails to
10           disclose the false claim to the state or the political subdivision within a reasonable
             time after discovery of the false claim.

11

12       61.    In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal.

13   Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal

14   patients pursuant to Cal. Welf. & Inst. Code §14107.2.

15       iv.    False Claims Acts of the Secondary States

16       62.    Illinois:

17       a.    The Illinois Whistleblower Reward and Protection Act, 740 ILCS 175, *et seq.*,

18           provides liability for any person who:

19           (1) knowingly presents, or causes to be presented, to an officer or employee of the
             State a false or fraudulent claim for payment or approval;

20
             (2) knowingly makes, uses, or causes to be made or used, a false record or
21           statement to get a false or fraudulent claim paid or approved by the State; or

22           (3) conspires to defraud the State by getting a false or fraudulent claim allowed or
             paid.

23
         b.    In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud
24
             and Kickbacks) prohibits the solicitation or receipt of any remuneration, including
25
             any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or
26

27

28                                        -20-

1      in kind, in return for furnishing any item or service for which payment may be

2      made, in whole or in part, under the Illinois Medicaid program.

3  c.    The Illinois state Medicaid program receives reimbursement from the federal

4      government for the federal share of its state Medicaid program's expenditures.

5      The claims that have been submitted to the Illinois state Medicaid program are

6      used to support a provider's reimbursement request.  In this way, if a provider

7      submits a fraudulent claim to Illinois's state Medicaid program, he/she/it not only

8      violates the Illinois Whistleblower Reward and Protection Act, but also has

9      caused a false claim to be submitted to the federal government in violation of the

10     FCA.

11  d.    Accordingly, each fraudulent claim submitted by Defendants under the scheme

12     described herein to Illinois's state Medicaid Program violated both Illinois law

13     and the FCA.

14  63.  Indiana:

15  a.    The Indiana False Claims and Whistleblower Protection Act, Indiana Code

16     5-11-5.5, *et seq.*, imposes liability on:

17     (b) A person who knowingly or intentionally:
       (1) presents a false claim to the state for payment or approval;

18

19     (2) makes or uses a false record or statement to obtain payment or approval of a
       false claim from the state;

20     (3) with intent to defraud the state, delivers less money or property to the state
       than the amount recorded on the certificate or receipt the person receives from the

21     state;

22     (4) with intent to defraud the state, authorizes issuance of a receipt without
       knowing that the information on the receipt is true;

23

24     (5) receives public property as a pledge of an obligation on a debt from an
       employee who is not lawfully authorized to sell or pledge the property;

25     (6) makes or uses a false record or statement to avoid an obligation to pay or
       transmit property to the state;

26

27

28                     -21-

(7) conspires with another person to perform an act described in subdivisions (1) through (6); or

(8) causes or induces another person to perform an act described in subdivisions (1) through (6)....

b. In addition, Indiana Code § 5-11-5.5, *et seq.*, prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made, in whole or in part, under the Indiana Medicaid program.

c. The Indiana state Medicaid program receives reimbursement from the federal government for the federal share of its state Medicaid program's expenditures. The claims that have been submitted to the Indiana state Medicaid program are used to support a provider's reimbursement request. In this way, if a provider submits a fraudulent claim to Indiana's state Medicaid program, he/she/it not only violates the Indiana False Claims and Whistleblower Protection Act, but also has caused a false claim to be submitted to the federal government in violation of the FCA.

d. Accordingly, each fraudulent claim submitted by Defendants under the scheme described herein to Indiana's state Medicaid Program violated both Indiana law and the FCA.

64. New Jersey:

a. The New Jersey False Claims Act, N.J.S.A. § 2A:32C-3, provides for liability for any person who:

a. Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b. Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

-22-

c. Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

d. Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

e. Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

f. Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or

g. Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

b.  In addition, N.J.S.A. § 30:4D-17 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made in whole or in part under the New Jersey Medicaid program.

c.  The New Jersey state Medicaid program receives reimbursement from the federal government for the federal share of its state Medicaid program's expenditures. The claims that have been submitted to the New Jersey state Medicaid program are used to support a provider's reimbursement request. In this way, if a provider submits a fraudulent claim to New Jersey's state Medicaid program, he/she/it not only violates the New Jersey False Claims Act, but also has caused a false claim to be submitted to the federal government in violation of the FCA.

d.  Accordingly, each fraudulent claim submitted by Defendants under the scheme described herein to New Jersey's state Medicaid Program violated both New Jersey law and the FCA.

-23-

65. <u>New York</u>:

a. The New York State False Claims Act, State Finance Law § 189, imposes liability on any person who:

(a) knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government; or

(c) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

b. In addition, New York law prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for furnishing any item or service for which payment may be made, in whole or in part, under the New York Medicaid program.

c. The New York state Medicaid program receives reimbursement from the federal government for the federal share of its state Medicaid program's expenditures. The claims that have been submitted to the New York state Medicaid program are used to support a provider's reimbursement request. In this way, if a provider submits a fraudulent claim to New York's state Medicaid program, he/she/it not only violates the New York State False Claims Act, but also has caused a false claim to be submitted to the federal government in violation of the FCA.

d. Accordingly, each fraudulent claim submitted by Defendants under the scheme described herein to New York's state Medicaid Program violated both New York law and the FCA.

-24-

66.  Ohio:

a.  While Ohio has not enacted a state version of the FCA, the Ohio Revised Code

outlines offenses by State Medicaid Providers that may be prosecuted on behalf of

the State by the State Attorney General, Ohio Rev. Code § 5164.35.  The statute

provides that:

(B) (1) No medicaid provider shall do any of the following:

(a) By deception, obtain or attempt to obtain payments under the medicaid
program to which the provider is not entitled pursuant to the provider's provider
agreement, or the rules of the federal government or the medicaid director relating
to the program;

(b) Willfully receive payments to which the provider is not entitled;

(c) Willfully receive payments in a greater amount than that to which the provider
is entitled;

(d) Falsify any report or document required by state or federal law, rule, or
provider agreement relating to medicaid payments.

(2) A medicaid provider engages in "deception" for the purpose of this section
when the provider, acting with actual knowledge of the representation or
information involved, acting in deliberate ignorance of the truth or falsity of the
representation or information involved, or acting in reckless disregard of the truth
or falsity of the representation or information involved, deceives another or
causes another to be deceived by any false or misleading representation, by
withholding information, by preventing another from acquiring information, or by
any other conduct, act, or omission that creates, confirms, or perpetuates a false
impression in another, including a false impression as to law, value, state of mind,
or other objective or subjective fact. No proof of specific intent to defraud is
required to show, for purposes of this section, that a medicaid provider has
engaged in deception.

(C) Any medicaid provider who violates division (B) of this section shall be
liable, in addition to any other penalties provided by law, for all of the following
civil penalties:

(1) Payment of interest on the amount of the excess payments at the maximum
interest rate allowable for real estate mortgages under section 1343.01 of the
Revised Code on the date the payment was made to the provider for the period
from the date upon which payment was made, to the date upon which repayment
is made to the state;

(2) Payment of an amount equal to three times the amount of any excess
payments;

-25-

1   (3) Payment of a sum of not less than five thousand dollars and not more than ten
    thousand dollars for each deceptive claim or falsification;

2   (4) All reasonable expenses which the court determines have been necessarily

3   incurred by the state in the enforcement of this section.

4   b.  The Ohio state Medicaid program receives reimbursement from the federal

5       government for the federal share of its state Medicaid program's expenditures.

6       The claims that have been submitted to the Ohio state Medicaid program are used

7       to support a provider's reimbursement request. In this way, if a provider submits

8       a fraudulent claim to Ohio's state Medicaid program, he/she/it has caused a false

9       claim to be submitted to both the State of Ohio and the federal government in

10      violation of the FCA.

11  c.  Accordingly, each fraudulent claim submitted by Defendants under the scheme

12      described herein to Ohio's state Medicaid Program violated both Ohio law and

13      the FCA.

14  67.  Pennsylvania:

15  a.  While Pennsylvania has not enacted a state version of the FCA, the Pennsylvania

16      state Medicaid program receives reimbursement from the federal government for

17      the federal share of its state Medicaid program's expenditures. The claims that

18      have been submitted to the Pennsylvania state Medicaid program are used to

19      support a provider's reimbursement request. In this way, if a provider submits a

20      fraudulent claim to Pennsylvania's state Medicaid program, he/she/it has caused a

21      false claim to be submitted to the federal government in violation of the FCA.

22  b.  Accordingly, each fraudulent claim submitted by Defendants under the scheme

23      described herein to Pennsylvania's state Medicaid Program violated the FCA.

24

25

26

27

28                                      -26-

**C. Defendants Systematically Defrauded the Government In Violation Of The FCA By Purposefully Concealing The Financial Relationship Between The AmeriWound Companies And The SNFs And By Implementing A Medically Unnecessary and Excessive Wound Care Scheme**

i. The Conflicted Relationship Between the AmeriWound Companies and Rechnitz

68. Upon information and belief, and at all relevant times herein, Rechnitz has or has had financial interest, influence, and control over the AmeriWound Companies.

69. At his explicit direction, Rechnitz was in constant communication and intimately involved with the contractual arrangements, financial management, strategic planning, and day-to-day operations of the AmeriWound Companies. Indeed, from the AmeriWound Companies' inception, Rechnitz's involvement and connections in the industry were key to developing and supporting the AmeriWound Companies' business.

70. When Relator first interviewed for the Area Manager position with AmeriWound in August 2012, he met with Schachter, who told him that Rechnitz was the owner of both the SNFs and AmeriWound, and that, while Rechnitz would be a silent, behind-the-scenes partner, this arrangement would provide AmeriWound a great opportunity to develop its business and quickly gain market share.

71. Rechnitz's ability to control and influence the AmeriWound Companies occurred in two ways. First, given the vast network of SNFs he owned and managed, Rechnitz was able to guarantee that the AmeriWound Companies would be able to contract with a significant number of SNFs under his purview. Second, Rechnitz's ownership interests in TwinMed and Ramat enabled him to offer favorable rates to the unaffiliated SNFs for products and supplies in exchange for their agreement to use AmeriWound and CWH as their wound care providers.

72. At a critical point in the early development of the AmeriWound Companies' fraudulent scheme, intervention was required to force SNFs to terminate their existing wound care providers and to contract with the AmeriWound Companies instead. When force was required, Schachter asked Majer for Rechnitz to intervene.

-27-

73.    By way of example, in a January 29, 2013, email, Schachter wrote to Majer and requested Rechnitz's assistance with Rockport facilities:

> Is there a way that we can get all the facilities together in one room, have someone from Rockport or Shlomo inform them that this transition needs to take place immediately?  We could then provide the additional information to the attendees and get the facilities moving forward.

In Majer's and Schachter's follow up emails, Rechnitz was actually included as a recipient, and was given specific details about which SNFs and which administrators had not been cooperative, as well as a full description of the problems the AmeriWound Companies were encountering with these facilities.

74.    Rechnitz intervened again on behalf of CWH one week later, on February 3, 2013, when Schachter stated in an email to Relator that: "My guess is that Sol already met with Shlomo last night.  Nevertheless, I am forwarding this to Sol."  Then, in the subsequent email, Majer confirmed his meeting with Rechnitz:

> I did meet with Shlomo last night and discussed California Wound Health with him at length.  He wants to meet with you next time you are in L.A.  In the meantime, let's have a conference call to discuss the best action plan to get all facilities to cooperate. If you email back some times that you and Brian (and whoever else may want to join) are available, we can set something up.

75.    Three months later, in May 2013, Rechnitz appeared to increase his level of involvement in AmeriWound's development efforts.  In a May 1, 2013 email, Schachter assured Plaintiff-Relator Silver that:

> I spoke to Sol today and he has asked me to prepare this report for Shlomo.  Brian, Samson, Bill, and Ross, we will need to address where we are with each facility, issues, problems, and quite a bit more for both California and Ohio.
>
> Shlomo indicated he plans to get more involved and therefore he wants to understand facility by facility whether there are obstacles, hold ups, concerns, number of encounters, revenue by facility, etc.  He wanted California separately reported and Ohio separately reported. For the latter, he wants to understand how many Ohio contracts are in effect, how many starts we have, revenue and printability [sic]/loss by facility as well as growth projections for Ohio and California over the next 60, 90, 120 days and 12 month[s].

76.    Rechnitz's connections and intervention appeared to have paid off, when, a few months later, he was able to negotiate new business for the AmeriWound Companies with

-28-

1    independent SNFs, as confirmed in an August 13, 2013 email entitled, "Remaining Windsor

2    Facilities." In that email, Schachter wrote to various recipients, including Plaintiff-Relator

3    Silver, Fixler, and Borison, about how Rechnitz (to whom he referred as "SR") was meeting with

4    the owners of a number of SNFs because Rechnitz was dissatisfied when he discovered some

5    SNF owners instructed their staff that AmeriWound serviced only a limited number of facilities.

6    *Id.* Ultimately, Rechnitz prevailed, as he and the SNF owners:

> concluded an arrangement for all but 5 of the facilities that we will need to
> service. . . . SR's meeting today is to conclude a schedule of when we receive
> access to each of the other homes. Stay tuned as we will have to accelerate our
> provider recruitment to handle this new level of business. *Id.*

77.    Less than three weeks later, on August 30, 2013, Schachter followed up in an

email to Plaintiff-Relator Silver, asking him to identify "[w]hich facilities have been a problem

so that I can connect the dots for Sholomo?"

78.    Each of these examples demonstrates Rechnitz's ownership and financial interests

in and control over the AmeriWound Companies.

79.    In short, Rechnitz owned and/or managed a significant number of SNFs, owned

and/or managed the key suppliers to those SNFs (i.e., TwinMed, Ramat, Shoreline, and Twin

Pharmacy), and had ownership and/or financial interests in AmeriWound, which contracted with

the SNFs. Rechniz's ownership and/or management of both a significant number of the SNFs

and the key suppliers to those SNFs enabled him to arrange wound care contracts for the

AmeriWound Companies and to generate handsome profits across the board. CWH concealed

these relationships from DHCS and, when questioned, deliberately misled the agency with

respect to the manner in which CWH contracted with SNFs, as described below.

80.    Upon information and belief, Rechnitz's ownership and/or management interests

in both the SNFs and the key suppliers to those SNFs that enabled him to arrange wound care

contracts for the AmeriWound Companies extended beyond California to the Secondary States

where AmeriWound operated.

-29-

ii. Defendants' Omission of Material Information Regarding Rechnitz's Relationship and Involvement with the AmeriWound Companies

81. On multiple occasions, Defendants withheld material information from the DHCS about Rechnitz's relationship and involvement with the AmeriWound Companies. One such incident involved a July 2013 omission in a DHCS report regarding the financial relationship between CWH and an SNF that Rechnitz owned at that time, the Alhambra Healthcare and Wellness Center ("Alhambra"). Specifically, on July 11, 2013, Alhambra's administrator, Rhea Bartolome ("Bartolome"), contacted Relator after she was contacted by Jeffrey Phillips ("Phillips"), a representative of the DHCS Audits and Investigations Medical Review Branch, regarding her facility's contract with CWH. Bartolome asked Relator how she should respond to a question on a DHCS certification form entitled, "Questionnaire/Declaration for Alhambra Healthcare & Wellness Center," which states "4. Document here, the financial agreement between your facility and California Wound Health."

82. Unsure himself what information to provide, Relator contacted Schachter for guidance. Schachter instructed Bartolome to state that there was no "financial agreement" between CWH and Alhambra, even though Rechnitz clearly owned the facility and exercised financial ownership and control over CWH.

83. On July 17, 2013, Relator was called to another Rechnitz-owned and operated SNF, Driftwood Healthcare Center ("Driftwood") to coach the administrator, Jonathan Weiss ("Weiss"), on how to complete questions on the DHCS form regarding the relationship between CWH and the facility. However, this time, Phillips was actually onsite in the room outside of Weiss's office. Relator recalls that Weiss wanted to ensure they completed the form correctly. Weiss had Relator stay in his office and participate in a phone conversation with Schachter and Fixler regarding instructions on how to complete the form, specifically in response to questions about the financial relationship between CWH and Driftwood. Schachter and Fixler instructed Weiss to falsely state, *inter alia*, that no financial agreement existed between CWH and

-30-

1 Driftwood – a response that made Relator uncomfortable, because he felt it was an attempt to
2 disguise the true financial relationship between CWH and Rechnitz.

3     84.    Another incident took place one week later, on July 25, 2013, when Schachter,
4 Fixler, Borison, and Relator attended a meeting at Phillips's DHCS office. Prior to the meeting,
5 Schachter instructed Relator to let him answer all questions and not to speak up. At the meeting,
6 Phillips's questions focused on determining whether there was any financial relationship or
7 arrangement, of any kind, between CWH and the SNFs with which it contracted. At that time,
8 CWH was only in contract with Rechnitz-owned SNFs. Relator recalls that Phillips and his
9 DHCS colleagues asked, in various ways, about the relationship between CWH and the SNFs,
10 and that, to each question, Schachter was steadfast in denying any relationship between the
11 entities.

12     85.    After the meeting, Schachter took precautionary measures, and specifically
13 directed Relator and other CWH staff members to warn the SNFs that they might be contacted
14 by Phillips. Schachter instructed Relator and CWH staff members to "guide" the SNF staff to
15 respond as they did with Alhambra and Driftwood (i.e., indicate that there was no financial
16 relationship between CWH and the SNFs).

17     86.    Defendants had a practice of routinely and purposefully omitting and concealing
18 material information about Rechnitz's financial relationship and control over the AmeriWound
19 companies, and in doing so, defrauded the Government.

20     87.    Upon information and belief, a similar practice of routinely and purposefully
21 omitting and concealing material information about Rechnitz's financial relationship and control
22 over the AmeriWound companies took place beyond California, and occurred in the Secondary
23 States in which AmeriWound operates as well. As a result of this practice, Defendants
24 defrauded the federal Government by illegally recouping federal Medicaid dollars in each of the
25 Secondary States.

26

27

28     -31-

1
2

**D.**    **Defendants Systematically Defrauded The Government In Violation Of The FCA By The AmeriWound Companies Implementing An Unnecessary And Excessive Wound Care Scheme**

3

i.    The AmeriWound Companies' "All Wounds" Scheme

4    88.    In addition to the misrepresentations about Rechnitz's financial relationship with

5    the AmeriWound companies, Schachter also instructed Bartolome to misrepresent, on the DHCS

6    form, question number 6 (which requests information regarding CWH's procedure for notifying

7    a patient's primary care physician ("PCP")). Schachter told Bartolome to state that CWH

8    obtained orders from each PCP prior to providing wound care services to Alhambra's patients,

9    knowing that CWH physicians never, in fact, obtained such orders.

10    89.    Instead, CWH physicians treated the SNFs' patients at their own discretion and

11    without obtaining prior referral by the PCP. CWH physicians likely would not have received

12    PCP referrals because the services CWH physicians rendered were often medically unnecessary

13    or excessive, as described below. Even though CWH physicians did not obtain PCP orders,

14    Schachter instructed Bartolome to state on the DHCS form that they did obtain the orders,

15    increasing CWH's billing opportunities for reimbursement.

16    90.    At the aforementioned July 25, 2013 meeting, Schachter instructed Relator and

17    CWH staff members to "guide" the SNF staffs to falsely state on DHCS forms that the CWH

18    physicians receive PCP referrals prior to treating their patients, even though they did not receive

19    such referrals.

20    91.    As of May 30, 2013, CWH had contracts in place with the following Rechnitz-

21    owned SNFs under the Brius organization: Alhambra; Rehabilitation Center of Fresno, LLC;

22    Oakhurst Healthcare & Wellness Center, LLC; Wish-I-Ah Healthcare & Wellness Center, LLC;

23    Granada Rehabilitation & Wellness Center, LP; Pacific Rehabilitation & Wellness Center, LP;

24    Seaview Rehabilitation & Wellness Center, LP; Eureka Rehabilitation & Wellness Center, LP;

25    Fortuna Rehabilitation & Wellness Center, LP; Brighton Place–East; Brighton Place–San Diego;

26    Brighton Place–Spring Valley; Point Loma Convalescent Hospital; South Pasadena

27

28    -32-

1  Convalescent Hospital; Norwalk Skilled Nursing & Wellness Centre, LLC; Verdugo Valley
2  Skilled Nursing & Wellness Centre; Lakewood Healthcare; Granite Hills Healthcare & Wellness
3  Centre, LLC; Clairemont Healthcare & Wellness Centre, LLC; Centinela Skilled Nursing &
4  Wellness Centre East, LLC; Centinela Skilled Nursing & Wellness Centre West, LLC; Centinela
5  Assisted Living & Retirement; Hawthorne Healthcare & Wellness Center, LLC; Lawndale
6  Healthcare & Wellness Centre; Maywood Healthcare & Wellness Centre, LLC; Vernon
7  Healthcare Center, LLC; Burlingame Long Term Care, LLC; Las Flores Convalescent Hospital;
8  Lighthouse Healthcare Center, LLC; California Nursing & Rehabilitation Center, LLC; Park
9  Avenue Healthcare & Wellness Center, LLC; Novato Healthcare Center, LLC; Highland Park
10  Skilled Nursing & Wellness Centre, LLC; Four Seasons Healthcare & Wellness Center, LP; and
11  Four Seasons Assisted Living, LP.

12      92.     Also by May 30, 2013, CWH had contracts in place with the following SNFs
13  under C.O.R.E. Healthcare Solutions, Inc.: Oakland Healthcare & Wellness Center, LLC; The
14  Rehabilitation Center of Oakland, LLC; Alameda Healthcare & Wellness Center, LLC; Hayward
15  Healthcare & Wellness Center, LLC; San Jose Healthcare & Wellness Center, LLC; Cupertino
16  Healthcare & Wellness Center, LLC; San Pablo Healthcare & Wellness Center, LLC; Roseville
17  Healthcare & Wellness Center, LLC; and San Rafael Healthcare & Wellness Center, LLC.

18      93.     Again, by May 30, 2013, CWH had contracts in place with the following SNFs
19  under Citrus Healthcare, Inc.: Imperial Healthcare & Wellness Center, LLC; Desert Springs
20  Healthcare & Wellness Center, LLC; Alta Vista Healthcare & Wellness Center, LLC; Orange
21  Healthcare & Wellness Center, LLC; Rehabilitation Center of Bakersfield, LLC; Mesa Verde
22  Convalescent Hospital Inc.; Gridley Healthcare & Wellness Center, LLC; Gridley Assisted
23  Living; and Driftwood Healthcare & Wellness Center, LLC.

24      94.     Furthermore, by May 30, 2013, CWH had contracts in place with the following
25  additional SNFs: Ivy Creek Healthcare & Wellness Center, LP; York Healthcare & Wellness
26  Center, LP; El Rancho Vista Healthcare; Pasadena Park Healthcare & Wellness Centre, LLC

27

28                                          -33-

1   ("Pasadena Park"); Pine Grove Healthcare & Wellness Centre, LP; and Oxnard Manor

2   Healthcare Center.

3       95.     As a general matter, SNFs cannot seek reimbursement for wound care services

4   because the costs associated with these services are automatically included in the per-person

5   reimbursements SNFs receive for general long-term care.

6       96.     In contrast, AmeriWound and CWH are reimbursed for wound care services

7   because they bill directly the patients' insurers, which, at SNFs, are typically Medicare or

8   Medicaid. For those Medicare Part A patients who would otherwise be subject to the SNFs'

9   per-person reimbursement limitations, AmeriWound and CWH would seek reimbursement under

10  Medicare Part B.

11      97.     At each of these SNFs, Defendants consistently pressured SNF administrators and

12  staff to increase the number of patients that the AmeriWound Companies' providers were

13  permitted to treat. SNFs with low patient visits were deemed by Defendants as "non-compliant,"

14  and required greater pressure and attention.

15      98.     At the behest of Rechnitz, for instance, Defendants targeted non-compliant SNFs,

16  directing their administrators and staff to permit CWH providers to see all patient wounds–not

17  just serious wounds–contrary to the standard procedure of other industry wound care providers.

18  As Schachter reiterated to the administrator of Pasadena Park on January 30, 2013:

19          Our staff that treat your patients are all providers who unlike an
            STNA, Med Assistant, or RN can actually treat patients and bill
20          for their services. According to the aforementioned 2011 CMS
            Regulations, all wound assessments, diagnoses, treatments, and
21          prescriptions MUST be performed by a physician or a physician
            extender. . .
22
23      99.     The success of the AmeriWound Companies' "all wounds require treatment"

    scheme required that all patients experiencing any and all wound and/or skin issues be identified
24
    at every SNF. To accomplish this, Defendants demanded that the SNF administrators give them
25
    their master reports, also known as "skin sheets." These reports were critical to Defendants' "all
26

27

28                                              -34-

1  | wounds" approach, because they enabled Defendants' medical staff to dictate which patients
2  | they would see, when, and how often.

3  |     100.   Not only did this practice directly contradict Defendants' express representations
4  | to the DHCS that their medical staff only saw patients with PCP referrals or orders, it also
5  | violated the medical necessity requirement for billing for patient care.

6  |     101.   A skin wound is typically defined as any breakdown in soft tissue. Wounds are
7  | broken down into different categories by level of severity. Most rashes, non-severe redness,
8  | scratches, and "Stage 1" and/or "Stage 2" ulcers constituting wounds, can be safely and
9  | appropriately addressed by skilled nurses rather than physicians. Accordingly, the CMS industry
10 | standard is to have skilled nurses address these types of wounds.[1] Here, however, the
11 | AmeriWound Companies' business model and "all wounds treatment" mandate flout this
12 | industry standard and result in their seeking reimbursement for excessive and medically
13 | unnecessary services.

14 |     102.   Even though skilled nurses at the SNFs should have been treating patients' skin
15 | wounds, the AmeriWound Companies' "all wounds" approach required that such wounds be
16 | treated by AmeriWound physicians, solely to secure unnecessary and excessive fees for
17 | AmeriWound from Government-Funded Healthcare Programs. Mandating that physicians treat
18 | wounds that skilled nurses are qualified to treat constitutes excessive and unnecessary medical
19 | care.

20 |     103.   Defendants' pressure tactics did not stop with the SNFs. Defendants issued the
21 | same mandate to their own medical staff, in addition to the requirement that they see all patients
22 | identified in the SNFs' "skin sheets" at least twice per week, regardless of medical necessity.

23 |     104.   In a meeting that took place on June 24, 2013, Schachter and Fixler explained to
24 | Relator that seeing patients twice per week was imperative in order to meet Defendants'

25 |

26 |     [1]*See, e.g.*, CMS Manual System Pub 100-02 Medicare Benefit Policy, Transmittal 17,
27 | https://www.cms.gov/regulations-and-guidance/guidance/transmittals/downloads/r179bp.pdf.

28 | -35-

1 Medicare revenue objectives. To that end, they instructed Relator to create a report identifying
2 the SNFs with low numbers of patient visits and SNFs where patients were only seen by
3 Defendants once per week.

4      105.    According to what Schachter and Fixler told Relator, the purpose of the report
5 was to enable Defendants, including Rechnitz, to target those non-compliant SNFs in order to
6 increase their physician visits at the low-performing facilities and, thus, increase Medicare
7 billings overall for the AmeriWound Companies.

8      106.    Defendants carried out their multi-pronged strategy (i.e., requiring that
9 AmeriWound physicians see all wounds, obtaining SNFs' "skin sheets," and mandating that all
10 patients be seen twice weekly) consistently and aggressively in their dealings with both the SNFs
11 and Defendants' own medical staff. This strategy, while contrary to industry standards, resulted
12 in excessive and medically unnecessary consultations that were submitted to the Government for
13 reimbursement.

14      107.    Upon information and belief, Defendants implemented a similar "all wounds"
15 scheme outside of California, in each of the Secondary States in which AmeriWound operates.

16      ii.    Defendants' Knowledge And Callous Disregard Of Repeated Physician And
            Facility Complaints Of Lack Of Medical Necessity And Value
17

18      108.    At all times during Defendants' implementation of their wound care scheme, they
19 received a multitude of complaints from SNF administrators and Defendants' own physicians
20 and employees, including Relator, regarding the unnecessary and excessive patient wound
21 treatment services that Defendants were requiring and then submitting to Medicare and Medicaid
22 for reimbursement.

23      109.    In July 2013, for example, one such complaint was raised by one of CWH's
24 wound care provider physicians, Dr. H.T., who was suddenly presented with seven additional
25 patients at a facility where he typically only saw three patients.

26

27

28                                              -36-

1  110.  Suspicious about the actual necessity of these visits, Dr. H.T. refused the

2  assignment and, in his place, Borison, who happened to be in town at the time, visited all ten

3  patients, seven of which, according to subsequent reports to Dr. H.T., turned out to be either

4  "nothing or very minimal."

5  111.  According to what Dr. H.T. told Relator, he did not think working for CWH

6  would involve following rashes and checking new patients just in case they may have a skin

7  problem, and/or following non-wound patients.

8  112.  Dr. H.T. further told Relator that because 99% of the CWH billing was submitted

9  to Medicare or Medicaid, and because patients and their family members were not likely to

10  complain about medically unnecessary treatment, he did not want to participate in a program that

11  was a billing ruse that provided no real value to the patient.

12  113.  Dr. H.T. soon parted ways with Defendants.

13  114.  Dr. G. was another physician who parted ways with the Defendants for similar

14  reasons as Dr. H.T.

15  115.  As Relator explained to Fixler about Dr. G., "He just didn't agree with the more

16  proactive model of seeing and treating the 'minor stuff and rashes'." Relator then let Fixler

17  know that a replacement doctor, Dr. M., had already been identified who was "ready to get

18  going." Fixler told Relator that he had already met with Dr. M. and agreed that she would be

19  onboard with CWH's treatment tactics, "When I met with [Dr. M.], I was very clear about our

20  pro-active approach (the little stuff) and she was ok with it."

21  116.  Despite these complaints, Defendants pressed ahead with their wound care

22  scheme and dealt with complaints or resistance in a number of ways. According to the Relator,

23  in response to opposition from their physicians and employees, Defendants simply insisted that

24  orders be followed or non-compliant employees would be terminated. For those physicians who

25  complied with Defendants' wound care scheme, Defendants rewarded them with even more

26

27

28                                          -37-

1  patient visits. In response to opposition from SNF administrators and staff, Defendants applied

2  significant pressure on them to comply with Defendants' mandates.

3      117.   Defendants regularly prepared facility "compliance" reports to deal with facilities

4  that did not fall in line with Defendants' mandates. Schachter and Borison applied the first line

5  of pressure upon non-compliant facilities. If such measures did not work, Rechnitz (or Majer, on

6  Rechnitz's behalf) contacted the facilities' administrators to pressure them to comply.

7      118.   Defendants went so far as to fund and commandeer the assistance of an

8  independent organization that provides clinical and compliance guidance to SNFs. Schachter

9  told Relator that this organization received funding from Rechnitz, and in exchange, the

10  organization agreed to increase patient encounters and billings by publishing materials that

11  supported the AmeriWound Companies' wound care.

12      119.   Defendants went to great lengths to pressure and manipulate SNFs to succumb to

13  their business model, knowing full well that the result of their compliance would be more patient

14  visits and more opportunities to bill the Government for these medically unnecessary and

15  excessive visits and procedures.

16      120.   Upon information and belief, Defendants similarly pressured and manipulated

17  SNFs in the Secondary States in which AmeriWound operates to succumb to Defendants'

18  business model, knowing that the result of their compliance would result in more opportunities

19  to bill the federal Government for these medically unnecessary and excessive visits and

20  procedures.

21  **E.**   **Rechnitz Systematically Defrauded The Government In Violation Of The AKS By**
       **Inducing SNFs To Contract With The AmeriWound Companies In Exchange For**

22         **Favorable Rates On TwinMed And Ramat Products**

23      121.   As described above, one of the pressure tactics that Rechnitz used to induce

24  SNFs to contract with AmeriWound was to offer them favorable rates on TwinMed and Ramat

25  products.

26

27

28                      -38-

1    122.    Rechnitz owns both TwinMed and Ramat, and has ownership and/or financial

2  control over the AmeriWound Companies. Upon information and belief, Rechnitz was able to

3  influence independently-owned SNFs to contract with the AmeriWound Companies for

4  AmeriWound services by offering SNFs favorable rates on TwinMed and Ramat products.

5       123.    The contracts between these SNFs and the AmeriWound companies essentially

6  required that the SNFs refer all wound care patients to AmeriWound for treatment.

7       124.    When SNFs agreed to contract with AmeriWound, they were then required to

8  comply with AmeriWound's "all wounds" scheme.

9       125.    Accordingly, all patients requiring wound care at the SNFs receiving favorable

10  rates were treated by AmeriWound physicians, even if a physician was not necessary to treat the

11  wound, and were treated at least twice a week, regardless of whether such treatment was

12  medically necessary.

13      126.    AmeriWound then billed Government-Funded Healthcare Programs for

14  reimbursement of the wound care services it provided.

15      127.    The favorable rates believed to be given by Rechnitz to these SNFs constituted

16  remuneration given to providers, which induced the providers to refer their patients to the

17  AmeriWound Companies, resulting in an illegal reimbursement to AmeriWound for the wound

18  care services.

19      128.    Each reimbursement received by AmeriWound directly resulted in income to

20  Rechnitz and the other Defendants. As such, each reimbursement resulting from these

21  fraudulently induced referrals and/or contractual arrangements constituted an illegal kickback in

22  violation of the AKS. These kickbacks reduced the patients' healthcare choices because the SNF

23  physicians recommended wound care services based on their own financial interests rather than

24  according to the patient's medical needs.

25      129.    Defendants participated and conspired with Rechnitz in connection with the

26  practices related to this scheme in violation of the AKS.

27

28                                        -39-

130.   Upon information and belief, similar remuneration was given to SNFs in the Secondary States to induce those SNFs to refer all their wound care patients to AmeriWound as well, in violation of the AKS.

**F.   The Scope And Cost Of Defendants' Fraudulent Billing Submitted To The Government**

131.   As a direct consequence of Defendants' fraudulent conduct, the AmeriWound Companies submitted thousands of claims for excessive and unnecessary wound care services to the Government for reimbursement.

132.   The American Medical Association maintains a database of Current Procedural Terminology ("CPT") codes including those for wound care services. AmeriWound billed their wound care services to Medicare and Medicaid using the following CPT codes: CPT 10060, 10061, 10140, for incision and drainage procedures on the skin; CPT 11042-11047, for debridement procedures on the skin; CPT 11100, for biopsy procedures on the skin; CPT 17250, for destruction procedures on skin lesions; CPT 43760, for procedures dealing with the stomach; CPT 97597-97598, 97602, 97605, and 97606, for active wound care management; CPT 99304-99306, for initial patient visits for wound care services conducted by AmeriWound physicians; CPT 99307-99310 for subsequent patient visits for wound care services conducted by AmeriWound physicians; and CPT 99325 and 99327, for home patient visits for wound care services conducted by AmeriWound physicians. The Medicare and Medicaid reimbursement rates for these services vary significantly based on year, which code is billed, and the MAC locality.

133.   Upon information and belief, at least 90-95% of the patients treated by AmeriWound physicians at SNFs were Medicare and/or Medicaid patients.

134.   For the six month period between January 1, 2013 and June 30, 2013, Defendants are believed to have earned approximately $1.5 million in revenue for approximately 5,700

-40-

1  AmeriWound physician procedures performed on Medicare and/or Medicaid patients at sixty
2  (60) SNFs in California. Based on these figures, AmeriWound earned an average of
3  approximately $262.00 per procedure, and approximately $10,000.00 per month per SNF
4  facility.

5        135.    Since this data is derived from Defendants' conduct in the nascent stages of their
6  business, and considering the consistent pressure applied to Defendants' staff and the staff of
7  SNFs alike to increase billing both throughout and subsequent to this period, this figure is likely
8  a conservative estimate. In fact, following this initial period in 2013, the scale of Defendants'
9  operation has grown and continues to grow at a significant pace. For example, while there were
10 thirty-four Rechnitz-owned SNFs that contracted during May and June 2013 with Defendants
11 under the Brius organization, by March 2015, Brius is believed to have ballooned to eighty-one
12 facilities, all utilizing AmeriWound for its wound care services.

13       136.    Also, although Defendants initially conducted business only in California and
14 Ohio, they have since expanded their operations to include SNFs in Illinois, Indiana, New Jersey,
15 New York and Pennsylvania. More specifically, they now employ regional managers covering
16 the following seven areas according to the information contained on AmeriWound's website:
17 Northern Ohio; Central and Southern Ohio; Northern California; Southern California; Illinois
18 and Indiana; New Jersey, Eastern Pennsylvania, and New York City; and New York.

19       137.    Based upon Relator's knowledge and personal experience, each regional manager
20 is responsible for covering approximately thirty SNFs. Consequently, AmeriWound is believed
21 to be servicing approximately 210 SNFs at the present time.

22       138.    It is estimated that based on the number of SNFs serviced by AmeriWound and
23 the estimated revenue derived during 2013, that Defendants are likely to have received
24 approximately $50 million dollars in reimbursement from Government-funded healthcare
25 programs.

26

27

28                                              -41-

1  139. The claims that the AmeriWound Companies submitted to the Government were
2  intentionally and materially fraudulent, false, misleading, and deceptive, and/or were submitted
3  with knowledge, deliberate ignorance, and/or reckless disregard of their falsity. Defendants not
4  only affirmatively lied about and failed to disclose to the Government the conflicts of interest
5  between Rechnitz and the AmeriWound Companies, they also misrepresented patient visits to be
6  medically necessary and valuable, when all were clearly not.

7  140. These false representations were material and were made by Defendants with the
8  intent and effect of misleading and deceiving the Government, which reasonably relied upon
9  such representations to its detriment, including by, *inter alia*, making reimbursement payments
10 to the AmeriWound Companies.

11 141. These false representations were made by Defendants with the intent to gain an
12 unfair economic benefit and advantage over the Government. Had the Government been aware
13 of Defendants' misconduct as alleged herein, the claims submitted by Defendants would not
14 have been paid by the Government.

15 

**COUNT I**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1) and**
**31 U.S.C. § 3729(a)(1)(A)&(C)**

16
17

18 142. Plaintiff-Relator Silver repeats and re-alleges each and every allegation contained
in the paragraphs above as though fully set forth herein.

19
20 143. Defendants knowingly submitted and caused to be submitted false or fraudulent
claims for payment or approval for medical services to officials of the United States Government
21 in violation of 31 U.S.C. § 3729(a)(1)(1986), and 31 U.S.C. § 3729(a)(1)(A)(2009) and/or
22 conspired to commit such acts or omissions in violation of 31 U.S.C. § 3729(a)(1)(C)(2009).
23
24 144. Had the United States known that Defendants were violating the federal laws
cited herein and/or that the claims submitted in connection with Defendants' conduct failed to
25 meet the reimbursement criteria of the Government-Funded Healthcare Programs or were
26
27
28

-42-

1    premised on false and/or misleading information, it would not have paid the claims submitted by

2    healthcare providers and third-party payers in connection with that conduct.

3     145.    By virtue of the false or fraudulent claims that Defendant presented, the United

4    States has suffered actual damages and is entitled to recover treble damages and a civil penalty

5    for each false claim.

6
7

**COUNT II**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)&(C)**

8     146.    Plaintiff-Relator Silver repeats and re-alleges each and every allegation contained

9    in the paragraphs above as though fully set forth herein.

10     147.    Defendants knowingly made, used, or caused to be made or used, false records or

11    statements material to false or fraudulent claims to the United States Government in violation of

12    31 U.S.C. § 3729(a)(1)(B)(2009) and/or conspired to commit such acts or omissions in violation

13    of 31 U.S.C. § 3729(a)(1)(C)(2009).

14     148.    By virtue of the false or fraudulent claims that Defendants made, used, or caused

15    to be made or used, the United States has suffered actual damages and is entitled to recover treble

16    damages and a civil penalty for each false claim.

17
18

**COUNT III**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)&(G)**

19     149.    Plaintiff-Relator Silver repeats and re-alleges each and every allegation contained

20    in the paragraphs above as if fully set forth herein.

21     150.    Defendants knowingly concealed or knowingly and improperly avoided or

22    decreased an obligation to pay or transmit money to the United States in violation of 31 U.S.C. §

23    3729(a)(1)(G) and/or conspired to commit such acts or omissions in violation of 31 U.S.C. §

24    3729(a)(1)(C)(2009).

25
26
27

**COUNT IV**
**Federal Anti-Kickback Statute**
**42 U.S.C. § 1320a-7b and**
**31 U.S.C. § 3729(a)**

28                              -43-

1      151.    Plaintiff-Relator Silver repeats and re-alleges each and every allegation contained

2  in the paragraphs above as if fully set forth herein.

3      152.    Defendants knowingly and willfully made and/or caused to be made false

4  representations of material facts in their applications for benefits under Government-Funded

5  Healthcare Programs and knowingly and willfully offered remuneration to induce persons to

6  refer individuals to a person for the furnishing or arranging for the furnishing of services for

7  which payments may be made in whole or in part under Government-Funded Healthcare

8  Programs in violation of 42 U.S.C. § 1320a-7b, which is a *per se* violation of 31 U.S.C. §

9  3729(a) under the PPACA, Public Law No. 111-148, § 6402(g).

10      153.    By virtue of the false or fraudulent claims that Defendant presented, the United

11  States has suffered actual damages and is entitled to recover treble damages and a civil penalty

12  for each illegal kickback.

### COUNT V
### California False Claims Act
### Cal. Gov't Code § 12651(a)(1) and (a)(2)

154.    Plaintiff-Relator Silver repeats and re-alleges each and every allegation contained

in the paragraphs above as though fully set forth herein.

155.    By virtue of the acts described above, Defendants knowingly submitted to

officers, employees, or agents of the State of California, false or fraudulent claims for payment

or approval.

156.    By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used, false records or statements to the California State Government to

obtain payment from the State of California for false or fraudulent claims.

157.    Defendants violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds

of thousands of false claims to be made, used, and presented to the State of California by their

deliberate and systematic violation of federal and state laws, including the FCA, the AKS, Cal.

Bus. & Prof. Code § 650-650.1, and Cal. Welf. & Inst. Code § 14107.2.

-44-

1      158.    The State of California, by and through the California Medicaid program, Medi-

2  Cal, and other state healthcare programs, and unaware of Defendants' conduct, paid the claims

3  submitted by healthcare providers and third-party payers in connection therewith.

4      159.    Compliance with applicable Medicare, Medi-Cal, and the various other federal

5  and state laws cited herein was an implied and, upon information and belief, also an express

6  condition of payment of claims submitted to the State of California in connection with

7  Defendants' conduct. Compliance with applicable California statutes and regulations was also

8  an express condition of payment of claims submitted to the State of California.

9      160.    Had the State of California known that Defendants were violating the federal and

10  state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

11  failed to meet the reimbursement criteria of the Government-Funded Healthcare Programs or

12  were premised on false and/or misleading information, it would not have paid the claims

13  submitted by healthcare providers and third-party payers in connection with that conduct.

14      161.    As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of

15  California has been damaged in an amount in excess of millions of dollars, exclusive of interest.

16      162.    Plaintiff-Relator Silver is a private citizen with direct and independent knowledge

17  of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code §

18  12652(c) on behalf of himself and the State of California.

19      163.    This Court is requested to accept supplemental jurisdiction over this related state

20  claim as it is predicated upon the same exact facts as the federal claim, and merely asserts

21  separate damages to the State of California in the operation of its Medicaid program.

**COUNT VI**
**Illinois Whistleblower Reward and Protection Act**
**740 ILCS 175, *et seq.***

24      164.    Plaintiff-Relator Silver repeats and re-alleges each and every allegation contained

25  in the paragraphs above as though fully set forth herein.

-45-

1      165.   Defendants violated 740 ILCS 175/3(a) and knowingly caused false claims to be

2 made, used, and presented to the State of Illinois by their deliberate and systematic violation of

3 federal and state laws, including the FCA, the AKS, and the Illinois Vendor Fraud and Kickback

4 statute.

5      166.   The State of Illinois, by and through the Illinois Medicaid program and other state

6 healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by

7 healthcare providers and third-party payers in connection therewith.

8      167.   Compliance with applicable Medicare, Medicaid, and the various other federal

9 and state laws cited herein was an implied, and, upon information and belief, also an express

10 condition of payment of claims submitted to the State of Illinois in connection with Defendants'

11 conduct. Compliance with applicable Illinois statutes and regulations was also an express

12 condition of payment of claims submitted to the State of Illinois.

13      168.   Had the State of Illinois known that Defendants were violating the federal and

14 state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

15 failed to meet the reimbursement criteria of the Government-Funded Healthcare Programs or

16 were premised on false and/or misleading information, it would not have paid the claims

17 submitted by healthcare providers and third-party payers in connection with that conduct.

18      169.   As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois

19 has been damaged in an amount, upon information and belief, in excess of millions of dollars,

20 exclusive of interest.

21      170.   Plaintiff-Relator Silver is a private citizen with direct and independent knowledge

22 of the allegations of this Complaint, alleging upon information and belief that Defendants

23 perpetuated their illegal conduct in Illinois, who has brought this action on behalf of himself and

24 the State of Illinois.

25      171.   This Court is requested to accept supplemental jurisdiction of this related state

26

27

28                                     -46-

1  claim as it is predicated upon the exact same facts as the federal claim, and merely asserts

2  separate damages to the State of Illinois, in the operation of its Medicaid program.

### COUNT VII
#### Indiana False Claims and Whistleblower Protection Act
#### Indiana Code 5-11-5.5, *et seq.*

5  172.  Plaintiff-Relator Silver repeats and re-alleges each and every allegation contained

6  in the paragraphs above as though fully set forth herein.

7  173.  Defendants violated Indiana's False Claims Act and knowingly caused false

8  claims to be made, used, and presented to the State of Indiana by their deliberate and systematic

9  violation of federal and state laws, including the FCA and the AKS.

10  174.  The State of Indiana, by and through the Indiana Medicaid program and other

11  state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by

12  healthcare providers and third-party payers in connection therewith.

13  175.  Compliance with applicable Medicare, Medicaid, and the various other federal

14  and state laws cited herein was an implied, and, upon information and belief, also an express

15  condition of payment of claims submitted to the State of Indiana in connection with Defendants'

16  conduct. Compliance with applicable Indiana statutes and regulations was also an express

17  condition of payment of claims submitted to the State of Indiana.

18  176.  Had the State of Indiana known that Defendants were violating the federal and

19  state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

20  failed to meet the reimbursement criteria of the Government-Funded Healthcare Programs or

21  were premised on false and/or misleading information, it would not have paid the claims

22  submitted by healthcare providers and third-party payers in connection with that conduct.

23  177.  As a result of Defendants' violations of Indiana's False Claims Act, the State of

24  Indiana has been damaged, upon information and belief, in an amount in excess of millions of

25  dollars, exclusive of interest.

-47-

1       178.    Plaintiff-Relator Silver is a private citizen with direct and independent knowledge

2 of the allegations of this Complaint, alleging upon information and belief that Defendants

3 perpetuated their illegal conduct in Indiana, who has brought this action on behalf of himself and

4 the State of Indiana.

5       179.    This Court is requested to accept supplemental jurisdiction of this related state

6 claim as it is predicated upon the exact same facts as the federal claim, and merely asserts

7 separate damages to the State of Indiana, in the operation of its Medicaid program.

8

9 **COUNT VIII**<br>**New Jersey False Claims Act**<br>**N.J.S.A. § 2A:32c-1, *et seq.***

10

11       180.    Plaintiff-Relator Silver repeats and re-alleges each and every allegation contained

12 in the paragraphs above as though fully set forth herein.

13       181.    Defendants violated the New Jersey False Claims Act and knowingly caused false

14 claims to be made, used, and presented to the State of New Jersey by their deliberate and

15 systematic violation of federal and state laws, including the FCA, the AKS, and N.J.S.A. §

16 30:4D-17.

17       182.    The State of New Jersey, by and through the New Jersey Medicaid program and

18 other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted

19 by healthcare providers and third-party payers in connection therewith.

20       183.    Compliance with applicable Medicare, Medicaid, and the various other federal

21 and state laws cited herein was an implied, and, upon information and belief, also an express

22 condition of payment of claims submitted to the State of New Jersey in connection with

23 Defendants' conduct. Compliance with applicable New Jersey statutes and regulations was also

24 an express condition of payment of claims submitted to the State of New Jersey.

25       184.    Had the State of New Jersey known that Defendants were violating the federal

26 and

27

28                                         -48-

1  state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

2  failed to meet the reimbursement criteria of the Government-Funded Healthcare Programs or

3  were premised on false and/or misleading information, it would not have paid the claims

4  submitted by healthcare providers and third-party payers in connection with that conduct.

5      185.    As a result of Defendants' violations of the New Jersey False Claims Act, the

6  State of New Jersey has been damaged, upon information and belief, in an amount in excess of

7  millions of dollars, exclusive of interest.

8      186.    Plaintiff-Relator Silver is a private citizen with direct and independent knowledge

9  of the allegations of this Complaint, alleging upon information and belief hat Defendants

10 perpetuated their illegal conduct in New Jersey, who has brought this action on behalf of himself

11 and the State of New Jersey.

12     187.    This Court is requested to accept supplemental jurisdiction of this related state

13 claim as it is predicated upon the exact same facts as the federal claim, and merely asserts

14 separate damages to the State of New Jersey, in the operation of its Medicaid program.

## COUNT IX
### New York False Claims Act
### State Finance Law § 189

17     188.    Plaintiff-Relator Silver repeats and re-alleges each and every allegation contained

18 in the paragraphs above as though fully set forth herein.

19     189.    Defendants violated the New York State False Claims Act, and knowingly caused

20 false claims to be made, used, and presented to the State of New York, by their deliberate and

21 systematic violation of federal and state laws, including the FCA and the AKS.

22     190.    The State of New York, by and through the New York Medicaid program and

23 other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted

24 by healthcare providers and third-party payers in connection therewith.

25     191.    Compliance with applicable Medicare, Medicaid, and the various other federal

26 and state laws cited herein was an implied, and, upon information and belief, also an express

27

28                                          -49-

1   condition of payment of claims submitted to the State of New York in connection with

2   Defendants' conduct. Compliance with applicable New York statutes and regulations was also

3   an express condition of payment of claims submitted to the State of New York.

4       192.    Had the State of New York known that Defendants were violating the federal and

5   state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

6   failed to meet the reimbursement criteria of the Government-Funded Healthcare Programs or

7   were premised on false and/or misleading information, it would not have paid the claims

8   submitted by healthcare providers and third-party payers in connection with that conduct.

9       193.    As a result of Defendants' violations of the New York State False Claims Act, the

10  State of New York has been damaged in an amount, upon information and belief, in excess of

11  millions of dollars, exclusive of interest.

12      194.    Plaintiff-Relator Silver is a private citizen with direct and independent knowledge

13  of the allegations of this Complaint, alleging upon information and belief that Defendants

14  perpetuated their illegal conduct in New York, who has brought this action on behalf of himself

15  and the State of New York.

16      195.    This Court is requested to accept supplemental jurisdiction of this related state

17  claim as it is predicated upon the exact same facts as the federal claim, and merely asserts

18  separate damages to the State of New York, in the operation of its Medicaid program.

## COUNT X
## Ohio Rev. Code § 5164.35

21      196.    Plaintiff-Relator Silver repeats and re-alleges each and every allegation contained

22  in the paragraphs above as though fully set forth herein.

23      197.    Defendants, as Medicaid providers, violated Ohio Rev. Code § 5164.35 by

24  "obtain[ing] [and] attempt[ing] to obtain payments under the [M]edicaid program to which

25  [Defendants] were not entitled pursuant to the [Ohio] provider agreement" through deception

26  and by "[f]alsify[ing] . . . document[s] required by state or federal law, rule, or provider

28                                              -50-

1    agreement relating to [M]edicaid payments," and, as such, knowingly caused false claims to be
2    made, used, and presented to the State of Ohio, by their deliberate and systematic violation of
3    federal and state laws, including the FCA and the AKS.

4        198.    Compliance with applicable Medicare, Medicaid, and the various other federal
5    and state laws cited herein was an implied, and, upon information and belief, also an express
6    condition of payment of claims submitted to the State of Ohio in connection with Defendants'
7    conduct. Compliance with applicable Ohio statutes and regulations was also an express
8    condition of payment of claims submitted to the State of Ohio.

9        199.    Had the State of Ohio known that Defendants were violating the federal and state
10   laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed
11   to meet the reimbursement criteria of the Government-Funded Healthcare Programs or were
12   premised on false and/or misleading information, it would not have paid the claims submitted by
13   healthcare providers and third-party payers in connection with that conduct.

14       200.    As a result of Defendants' violations of Ohio Rev. Code § 5164.35, the State of
15   Ohio has been damaged in an amount, upon information and belief, in excess of millions of
16   dollars, exclusive of interest.

17       201.    Plaintiff-Relator Silver is a private citizen with direct and independent knowledge
18   of the allegations of this Complaint, alleging upon information and belief that Defendants
19   perpetuated their illegal conduct in Ohio, who has brought this action on behalf of himself and
20   the State of Ohio.

21       202.    This Court is requested to accept supplemental jurisdiction of this related state
22   claim as it is predicated upon the exact same facts as the federal claim, and merely asserts
23   separate damages to the State of Ohio, in the operation of its Medicaid program.

24
25                                   **PRAYER FOR RELIEF**

26       WHEREFORE, Plaintiff-Relator Silver, on behalf of the United States and the States of
27   California, Illinois, Indiana, New Jersey, New York and Ohio, demands that judgment be entered

28                                            -51-

in their favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes, with respect to the federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim on or before November 2, 2015 and civil penalties of no more than Twenty-One Thousand Five Hundred and Sixty-Three Dollars ($21,563.00) and not less than Ten Thousand Seven Hundred and Eighty-One Dollars ($10,781.00) for each false claim after November 2, 2015, and any other recoveries or relief provided for under the Federal False Claims Act.

Plaintiff-Relator Silver requests that this Court enter judgment against Defendants: (1) in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Gov't Code § 12651(a); (2) in an amount three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct, and a civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants presented or caused to be presented to the State of Illinois; (3) in an amount three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct, and a civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants presented or caused to be presented to the State of Indiana; (4) in an amount three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendants' conduct, and a civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants presented or caused to be presented to the State of New Jersey; (5) in an amount three times the amount of actual damages which the State of New York has sustained as a result of Defendants' conduct, and a civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants presented or caused to be presented to the State of New York; and (6) in an amount equal to three times the amount of any excess payments, payment of

-52-

1  interest on the amount of the excess payments at the maximum interest rate allowable for real

2  estate mortgages under section 1343.01 of the Ohio Revised Code on the date the payment was

3  made to the provider for the period from the date upon which payment was made, to the date

4  upon which repayment is made to the state, payment of a sum of not less than $5,000 and not

5  more than $10,000 for each deceptive claim or falsification which Defendants presented or

6  caused to be presented to the State of Ohio; in addition to pre-judgment interest and all costs

7  incurred in bringing this action.

8          Finally, Plaintiff-Relator Silver requests that he receive the maximum amount permitted

9  by law of the proceeds of this action or settlement of this action collected by the United States,

10  and the States of California, Illinois, Indiana, New Jersey, New York, and Ohio, plus reasonable

11  expenses necessarily incurred, and reasonable attorney's fees and costs. Plaintiff-Relator Silver

12  requests that his award be based upon the total value recovered, both tangible and intangible,

13  including any amounts received from individuals or entities not parties to this action.

14                                **DEMAND FOR JURY TRIAL**

15          Plaintiff-Relator Silver hereby demands trial by jury as to all claims so triable pursuant to

16  Fed. R. Civ. P. 38 on all counts.

17

18

19  Dated: December 22, 2017              Respectfully submitted,

20                                        SHEPHERD, FINKELMAN, MILLER
                                            & SHAH, LLP
21
                                          /s/
22                                        Chiharu G. Sekino (SBN 306589)
                                          Shepherd Finkelman Miller
23                                          & Shah, LLP
                                          44 Montgomery Street, Suite 650
24                                        San Francisco, CA 94104
                                          Telephone: (415) 429-5272
25                                        Facsimile: (866) 300-7367
                                          Email: csekino@sfmslaw.com
26
                                          James E. Miller (SBN 262553)
27                                        Laurie Rubinow (to be admitted *pro hac vice)*
                                          Shepherd Finkelman Miller
28                                          & Shah, LLP

                                            -53-

1

2

3

4

65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
Email: lrubinow@sfmslaw.com

Monique Olivier (SBN 190385)
Duckworth, Peters, Lebowitz, Olivier, LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 433-0333
Facsimile: (415) 499-6556
Email: monique@dplolaw.com

5

6

7

8

9   *Attorneys for Plaintiff-Relator*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28